Madam Clerk, would you call the next case, please? 104310, People v. Andre Crawford. Lawyers, approach, please, and identify yourselves for the record and who you represent. Good morning, Your Honors. Jessica Hunter, formally with the State Appellate Defender's Office for Mr. Crawford. And I'm Assistant State's Attorney Mary Bowen on behalf of the people. B-O-L-A-N-D? B-O-L-A-N-D. Don't go away, lawyers. Hold on. I believe you received a copy and order from this court that was entered on October 10th relative to certain issues as to the DVD transcript, or the record that we want to make whole here. I'd like to get a status on what's going on. We asked for compliance on it before November 1st. Sure. Your Honors, I have ordered, I did procure copies of the DVD, provided them to the appellate clerk in an informal manner. I need to get those back so I can have them bound and certified. And then I ordered from our trial file the transcripts, was able to get those in yesterday in my office. And so I need to go through those, make the necessary copies, make sure counsel is fine with that, and as soon as we have an agreement, which I don't think there will be an issue, but I just want to make sure everybody's on board, then I'll go ahead and get those bound and certified as well. So we should be able to get that done. Obviously I'm not in control of the clerk's office, so how long they will take to bind and certify, I don't know. But I did get those in my office from our vault yesterday. So progress has been made? Yes. Counsel, is that your understanding as well? Yes, I concur. Okay. Do you think you'll be able to agree? Yes, I believe we will. I would just note for the record that the parties don't contest the substance of the confessions in the briefs or I imagine an oral argument, we are in agreement about the contents of those particular and all the confessions. We certainly want to have everything before us and read before we proceed with making a ruling. So all right, well thank you very much for that report and comment. Are you ready to proceed? Counsel, ten minutes if you would, and then of course questions. And if you want to reserve five, that's up to you. Thank you. Good morning, Your Honors. Again, my name is Jessica Hunter, formerly with the State Appellate Defender's Office. I represent Andre Crawford before the Court this morning, and I'd like to focus on issues one and four in the brief, which address the Batson issue and the confrontation issue. Counsel, what do you mean formally with the State Appellate Defender? I am no longer with the State Appellate Defender and represent Andre Crawford pro bono. Thank you for the clarification, Counsel. May I reserve three minutes for rebuttal? Yes, Counsel, you may. Thank you. With respect to the Batson error, we are requesting a very narrow form of relief here, a limited remand in this case because the judge failed to conduct the third step of the three-step Batson inquiry, and therefore erred as a matter of law. This is the remedy that this Court and the Illinois Supreme Court has ordered whenever a judge has either improperly collapsed the three stages or makes an ultimate ruling on discriminatory intent without a complete inquiry. Counsel, let me ask you a preliminary question here. Which is it? Do you think it was collapsed or the Court didn't act appropriately according to the three steps? I ask you, is the standard of review different depending upon which argument you make? Well, if the judge were to have gone through all three steps and come to a determination based on the Batson procedure, then it would be an abuse of discretion. But where the judge either conflates the steps or skips a step, then the question is truly a matter of law, and this Court reviews it de novo, whether the judge's decision is infirm because he or she did not follow the process set out by the United States Supreme Court. So in this case, that's what we're alleging, that essentially after the judge procured a purportedly race-neutral reason from the prosecutor with respect to why he was seeking to strike a particular African-American juror, she just ended the inquiry, did not, one, permit defense counsel an opportunity to show that that reason was pretextual, which is a necessary part of the third step, and then two, did not consider the State's reason in light of rebuttal by defense counsel and the totality of the judge's observations and knowledge about Wadir at that point. Had the judge applied Batson as you believe she should have? No. No. Had she done so? Yes. What would be different? What would the transcript say that it doesn't say now? Okay, so had the judge allowed the third step, what would have happened, I imagine, in some form or another is that the defense would have been allowed to do exactly what it twice requested to do, to show that Lois Marshall, the African-American juror the State sought to strike, was comparative to other non-African-American jurors that the State had accepted, which is one of the many ways in which a party can show that the State's stated reason is a pretext for discrimination. Then the prosecutor presumably would be able to either respond, the judge would address the demeanor of the prosecutor in his response, which is one of the things the judge is tasked with doing, and then the judge would be reminded by the defense of Lois Marshall's actual responses during Weatherspoon, which we believe were misstated by the prosecutor in giving his basis for seeking to strike her, and then the judge would have made a determination based on the rebuttal, based on her observations, and based on the stated reason whether or not this was a pretext for discrimination. So there was a very meaty, substantive part of the Batson process that did not take place here. Ms. Hunter, didn't the judge ask the defense lawyer to give her an example of the, when they spoke in very general terms, that there were things that other white jurors also believed, that Ms. Marshall believed, and those jurors were selected and Ms. Marshall wasn't, and the judge said, for example, give me a couple of examples, and she asked that a couple of times, and they didn't give her any examples. What about that? Well, I believe that Your Honor is addressing the first stage of the Batson hearing. I'm just asking a question. I mean, what about that? When she asked, give me some examples, and they said, and the defense lawyer didn't give an example. She asked a couple of times. What about that? You just gave a lengthy discourse about they would have been allowed to explain what it was that was different, not saying that I read in the transcript where she asked that, and they said nothing in response. So what about that? Well, I would disagree with Your Honor's reading of the record in the sense that she actually asked counsel to make that comparison, because that's exactly what counsel was attempting to do. Rather, what the court said is, you had a chance to do that. So he is, so you're saying that when the judge asked her, asked the defense lawyer, tell me what are you referring to when you say that there were similar things? You're saying that the defense lawyer gave the judge a response to that question. Is that your response? What I'm saying is that the judge never asked the defense counsel specifically to give a comparative juror. Maybe they didn't use the words I'm using, but I think that Or any words to that effect. I'm asking specifically, didn't she ask that question? She did not. She explained as her reason, respectfully, she did not. She explained, you had an opportunity, defense, to give me that information, and that is why I'm not permitting you to do it now. So she didn't ask, and that's exactly what the defense was seeking to do. And so the question really is the judge's misapprehension about what kind of inquiry happens when. The defense could have made a juror comparison at the first stage and did in fact say that Ms. Marshall wasn't substantially different than any of the other jurors, the non-African-American jurors that the state had accepted. And then the trial court was satisfied that that was a prima facie case. She did not request the defense to make any further showing. And then she asked the state to provide a race-neutral reason. And the law out of the U.S. Supreme Court and out of this Illinois Supreme Court is that once the judge requests a prima facie, excuse me, a race-neutral reason from the prosecutor, the question about whether the defense has made an adequate prima facie case is moot. And that's because the question truly turns to the basis of the state's reason for striking or seeking to strike that juror. In Hernandez v. New York, the U.S. Supreme Court analogized this mootness issue with respect to employment discrimination and essentially said, well, the defendant has done everything he would be required to do if the plaintiff had made out the prima facie case, whether the plaintiff really did is no longer relevant. Because truly what we're trying to get at here is, is the reason provided by the prosecutor a pretext for discrimination. I want to ask you this. After, let's say, they made a prima facie case, defendant made a prima facie case, the prosecution then comes back and presents a general neutral, a neutral race-neutral explanation. And the court on its own, after observing what's been going on with the veneer and paying careful attention, are you saying the court must allow the defendant time to respond or may allow the defendant time to respond? Must, must allow. And this is why. The defense has the burden of persuasion. So just like in closing argument, when the state has the burden, they are permitted an opening and a closing, the defense needs to be able to show that that reason is pretextual. And I think that that reason aids the court. And in this case, the reason given by the state was not in fidelity with the record. What the state did say is that Ms. Marshall was against the death penalty, unequivocally. That is not, there were over 100 jurors that were voir dire. That was not what her responses were. She equivocated, but then eventually she said, you know, I would base my decision on the law. I would not refuse to sign a death verdict. I would base my decision on the law. So if the court had the benefit of defense counsel's retort, then the court could have made a reasoned decision. But what did defense counsel do after that then? What did defense counsel do? Defense counsel twice asked to state a rebuttal and essentially said, I'm not sure how we can show this is a pretextual reason before we know what the reason is. Because the judge was saying you had an opportunity to show pretext at the first stage by, for instance, drawing a cross comparison with other veneer persons. This was an explanation for why she was denying the rebuttal. And the defense said, yes, but they have now stated a particular reason. How can we show that that reason is pretextual? And I would remind this court that the race-neutral reason, it need not even, it doesn't need to be persuasive. It need not even be plausible. It is just a reason that doesn't have discrimination inherent. So long as the state says something that isn't inherently discriminatory for its basis, then that reason will suffice, and then it's the defense's opportunity to rebut it. But if the judge simply accepts that facially neutral reason without any further inquiry, then the process has been thwarted and not a clear and reasoned decision on the motion can be made. So the fact that this woman said that I have an issue with the death penalty, or it was an issue certainly with the death penalty, that's not enough? Well, what she said, well, it would be enough if that were the actual reason. And we don't know if that were the state's actual reason, because this process was not completed. If the defense had had an opportunity to rebut and had told the judge, actually what Ms. Marshall had said was I would base my decision on the evidence, I could sign a death verdict after looking at the evidence, and the judge was still, nonetheless, after considering that rebuttal and her own observations, convinced that that was the state's reason, that would have been a proper basis for the state to dismiss this juror, but we don't know because we didn't complete the process here. And that's what we're asking for, something very modest. We're asking that the judge be able to complete the process. And I think the judge's statements on the record reveal that this was a truncated procedure due to a misapprehension of law, because what she said after explaining that the defense didn't have an opportunity to rebut, she said this court finds that they, the state, did offer a race-neutral reason. So it doesn't go back to you, which says essentially that once the state completes the second stage, there is no further inquiry, either contribution from the defense or presumably a consideration by the judge. So that's why I ask you, what case says that the court must allow defense to make a response? Well, actually, this court decided in 2000 in People v. Martinez that where the court does what it did here, fails to evaluate the genuineness of the state's reason and fails to consider rebuttal from the defense, that the case must be remanded for a limited purpose of determining a new Batson hearing. How do we know the court didn't review the genuineness of the state's reason? I think it's evident in the court's explanation to the parties, where she says it doesn't go back to you. They have stated a race-neutral reason inquiry over. She certainly didn't put any other findings on the record. So it seemed as though what was truly going on here was a misapprehension as to what her duties were at that point. She said the state then offers a race-neutral reason. It was based on her response to Witherspoon. That's valid. And then it doesn't go back to you. Inquiry over. So we don't have any discussion after the court expresses its opinion about the defense's inopportunity to rebut, that the court is still going on on her own and making this determination. And what People v. Martinez said is that the court must determine whether the defendant has met his burden. Again, back to the defense's burden of purposeful discrimination by weighing the evidence in light of the prima facie case, the prosecutor's reason, and any rebuttal by defense counsel. And these are the three things that the court must consider. That's also reflected in the Illinois Supreme Court's decision of People v. Davis, where in that case the court never performed the third stage. And the Illinois Supreme Court in Davis said, our review, like this court's review, is hampered by the inadequacy of the proceeding below. The record is undeveloped due to the way that the court conducted the hearing. And so given the enormity of this case, it's extremely important that not just this court, but that the court below consider this Batson claim and make a reasoned ruling on the claim with a proper apprehension of the law. And that's why we're asking for a limited remand with respect to Issue 1 in our briefs. If Your Honors have no other questions on Batson. And before you jump over to Issue 4, let me cover a couple points here. I want to verify for the sake of the argument today, the defense is making no arguments regarding the voluntariness of the confessions, is that correct? Not on appeal, no. However, it was an issue during the trial. And it looks like you were planning to skip over the DNA issue. I'm happy to discuss the DNA issue. But let me ask a question or two. You're arguing that the comparison of the number of loci was insufficient. And in that respect, you're relying, it appears almost entirely, on testimony that was given in a completely different case. That was not subject to cross-examination in this case or in this record. And then the question that obviously has to be posed is, how can we do that? How can we just take notice of some other expert from another case and throw it into this record? If I could clarify, I'm not precisely saying that the DNA comparisons were inadequate. What I'm saying is that there were inadequacies that trial counsel had an obligation to elucidate for the jury. And those are based on studies, on experts, on cases. There's a multitude of sources that counsel could have marshaled to her defense. And of course you're framing this as an ineffective assistance issue. Yes, and a prosecutorial misconduct claim as well. And that counsel did not do so. And yes, primarily we are focusing on the testimony, the deposition of Mr. Donald Parker, who is the administrator of the state's DNA offender database. And also studies out of various states that show that the mechanisms by which we're determining the statistical probabilities here are at least being called into some serious question. But as the second district in People v. Watson noticed, we don't necessarily have to affirm or substantiate any particular source. In Watson, the second district determined that the counsel in that case was ineffective for not marshaling these sources to her client's defense. Isn't Watson the case where Justice Burkett had a very lengthy dissent? Yes. Okay, so in Watson, just to make sure we're talking about the same case, there was no confession. That is correct. Which makes this case a little bit different than Watson, doesn't it? Yes, it does. It does, but if confessions were the old, most compelling evidence in a criminal case, DNA is the new, most compelling evidence. DNA is what juries hear, and they essentially, I think it's pretty clear, by studies and through observations of this court, they fold up their hands and determine case over when they hear DNA evidence, not necessarily scrutinizing the quality or the reliability of DNA evidence. But here's an issue before us in this case. These murders were tried together, all right? And we have a number of the victims, there was male DNA found on their person, correct? Yes. And the male DNA among the various deceased women matched to the same man, right? Right. Unlike if it was tried one murder at a time, the statistical improbability multiplies exponentially when you've got a number of different bodies found at different locations, right? Yes. Yes. And we believe there was a strategy in joining the cases. However, nonetheless, Mr. Crawford is entitled to be proven guilty beyond a reasonable doubt in each and every one of these cases. So the burden of proof and those strictures of the presumption of innocence and the reliability of evidence apply with respect to each particular victim. But what I think happened here is truly a denial of due process, in that this jury was inundated with these astronomical statistics that basically made it seem like they didn't even need to assess the reliability of his confessions. And then the state misused that evidence. I mean, I would just note that in Watson, you're right, we don't have the confession or the lack of the confession that the court considered in Watson, but the loci were considered in Watson with nine. Nine of the 13 that is standardly accepted by the FBI, by the Illinois Supreme Court. Was five not accepted, counsel? Well, this is really a question of admissibility. I believe now five would be – a defense counsel would be well within her rights to argue that five is so inadequate. But at the time of the trial of this case, five was perfectly acceptable, was it not? Well, I think what it was is that when the evidence was tested ten years before the trial, five was considered acceptable. But by the time the trial happened in 2010, five truly was no longer the norm. Five was exceedingly low, which is why the state did retest some of the cases with the 13 loci method. Was Mr. Wink the person who testified on behalf of the state relative to the five loci? Yes. It was actually Joanna. That was her maiden name. Okay. Or Ms., whatever. Yes. And wasn't that person cross-examined by a defense counsel? Yes, she was. And there were questions asked and answered relative to this issue of five loci, right? Yes, several, not many. But there were? Yes. Okay. Yes, there were. But what we're saying here is that Ms. Olsen was, Ms. Olsen, first of all, Ms. Olsen Wink, she hadn't taken any, she hadn't worked in this field in over ten years, which coincidentally is exactly when these huge advances in DNA technology had occurred and when also correspondingly a lot of increased scrutiny about the reliability of a five loci match or a six loci match or a seven loci, and even a nine loci match had started to be raised. So she was not truly an adequate person for the defense to present its theory. She was essentially unable to assist the defense in arguing that these five loci matches were inadequate because at the time that she was practicing in the field, they weren't. So what the defense needed to do is, just like it had done in the Juan Luna case, present their own expert to testify that the FBI considers anything less than 13 a non-identity match in order to reliably identify a particular person as an offender. And again, at the time that this DNA was taken, at the time of the crimes, that was an acceptable evidentiary admission and trial in Illinois. At the time the DNA was tested. Right. Is there anything different about that product rule when the trial occurred in this case? Well, yes. A great amount of skepticism. But as far as the admissibility of that evidence? Well, the admissibility would be up to the court. Right. Right. But there was no pretrial. That's part of our argument is there was no pretrial argument by the defense that these five loci were less than half of what courts now consider to be reliable. Less than half. Is there any testimony that they are unreliable? Would you say the defendants could have gotten that from a witness, saying that they are unreliable? Well, this witness was not interested in. . . No, no. Would a defense have been able to put on a witness saying the five loci is unreliable? Yeah, as far as identifying a particular offender, yes. That's exactly what a defense witness would say. That's what Donald Parker said in his deposition. That's what Carl Wright said as an expert witness for LUNA. That five does not reliably identify. . . That is totally unreliable. Well, it's only reliable in the context of its tendency to identify someone. So at a certain point, when the tendency is so low to actually reliably identify, that does, in fact, make an evidence. . . It makes it irrelevant, I suppose. But wouldn't that suggest everyone who was convicted, whose case involved the five loci DNI, would have the same argument? Yes, it does. It does, in fact, suggest that. And you'd have to, of course, look at the other evidence. But in cases in which someone is convicted on a five loci match and little else, or little else reliable evidence, yes, I believe those individuals would have an opposition. So where does this lead us? Let's say we agree with you on the DNA issue. Don't we still have the confessions? And isn't that sufficient to sustain the conviction? You do still have the confessions. But I would just indicate that the confessions were, while we don't make an argument on the appeal that they were coerced, we do know, especially in this state, that confessions, even those that aren't physically or psychologically coerced, can turn out to be false, and that this DNA was extremely important corroborative evidence for the confessions. And aside from the confessions, we have nothing else. So if this Court is comfortable affirming based solely on the confessions alone, then. . . So don't we do this quite often? Generally, there is other evidence, other bias or motive or witnesses. And we truly have nothing else in these cases, just simply his confessions, which are. . . So you don't like the five loci, and you don't like the DNA, the way it was used. But the DNA is a part of this case. And although you say that it's met with skepticism today, I know nothing that says that it's no longer admissible. Is that what your argument is? Our argument is that there's no cases that say at this moment. . . No one's even using five loci matches anymore, so it's hard. But you have to freeze this at a point in time. You know, this happened. . . The testing took place ten years ago. On another note, why did it take ten years for this case to come to trial? What took so long? I know that there were a lot of victims, but that was a question I wanted to ask. Why did it take ten years for this case to come to trial? Well, addressing that question first, I think primarily, in addition to the enormity of the cases, there was an interlocutory appeal in this matter, which I handled five years ago. So it took the entire time to come up to the appeal, to be decided, and then to be returned in order for the trial to then take place. But to address what Your Honor said initially with respect to the testing, yes, the testing took place ten years ago, but the trial took place three years ago. So the State had an opportunity to. . . The State was not hampered. It could have certainly retested the evidence, and it may have had the defense made a motion regarding admissibility, saying that while it may have been the case when the evidence was tested ten years ago, five was considered reliable, five is no longer considered reliable. To get back to Justice DeLort's question, what would that lead to? I mean, had the defense lawyer made a motion for this to be. . . What would that lead to? If, in fact, the DNA evidence was excluded, or. . . I'm not sure I understand. He said it could have been retested, and then so what? So we don't know what the retesting would have shown. Oh, yes, we do. So what if it would have shown that 13 loci matched? How does that help your client? Well, that would not help the client. Then the counsel would be in the same position that counsel was presumably in right now. I mean, there was really no reason not to.  Because essentially what the state's attorney. . . The state's attorney proceeded on the DNA as if it were a 13 loci match, telling the jury this is his DNA. This DNA separates him from anyone else in the entire world, and you would have to get into a rocket ship and travel many, many planets away before you found anyone that matched this DNA. Well, that may have been an appropriate yet hyperbolic argument to make on a 13 loci match, but it certainly wasn't on a 5 loci match. And so truly what we're having here is a . . . I believe it's a problem with the process here, where the jury was led to believe through defense counsel's lack of challenge and through the state's misuse that this DNA evidence said something that it just did not say. Counsel, let's get to your last argument then. With respect to confrontation, I know it is discussed later in the brief, but I wanted to discuss it today because I believe that this is the exceptional case that our Illinois Supreme Court in Leach was referring to when it said that under some circumstances an autopsy report and a substitute medical examiner's testimony relating the contents of that report implicates the confrontation clause. Dr. Jones, who was a substitute medical examiner in this case, she testified as to the cause and manner of Nicole Townsend's death over the defense objection. The defense objected that she was not the person that actually conducted the exam, she wasn't present for the exam, and therefore they didn't have an opportunity to truly test this evidence. So what do we do with People v. Leach? Excuse me? What do we do about People v. Leach? Well, I believe People v. Leach was talking about a situation just like this. Because what Leach, in considering the case that was before it, said this autopsy report is not testimonial because it was created by the medical examiner's office, not by law enforcement or at law enforcement's request, and it was done so in the manner in which it normally does so, right? And they're rendering their own independent opinion in accordance with their own duties as the medical examiner's office. And what Leach also said is we're not prepared to say that autopsy reports can never be testimonial in nature. And this is when they're testimonial in nature. When the primary purpose, according to Leach, is for either, they had to define the U.S. Supreme Court's decisions in Bullcoming, Melendez-Diaz, Davis, Crawford, and this is the rule that Leach discerned. The primary purpose of the report is either to establish past events potentially relevant to criminal prosecution, this is from the Davis decision, and that takes place where the police play a direct role in the autopsy, or to accuse a targeted individual, and that comes from the Williams decision, the DNA decision from last year. So what we are arguing is, so really the question being, is the medical examiner performing an independent analysis in accordance with its own duties, albeit knowing that the report may later be used? Why is this not independent, this report? Because the medical examiner in this case was influenced by the law enforcement to such a degree that the medical examiner became an agent of law enforcement. And this is why we say this. When Lifshultz, and we know this, just what we do know, we know from Dr. Jones's testimony. So there's, presumably there's much more that we would like to know about exactly the basis for Lifshultz's opinion that we don't know because he was in England. But that in August 14, 1998, Lifshultz performed the autopsy of Nicole Townsend, and he could not come to any conclusion about the manner and cause of her death. And this is essentially because there was no observable injury. And so he pended the examination for police investigation. So what we know at this point is that in his own professional qualifications, looking at it physically and medically, he can't tell as a professional of the medical examiner's office what happened to this person. Two months go by. And in those two months, what happens? Lifshultz learns from the police who this victim is, that she was a drug user, that she was found in an abandoned building. He had discussions with the police about the, quote, history and background of the case, which we don't know, although we would like to know. And that sometime in September, a month after Lifshultz performed his autopsy, the police faxed him a copy of a report concerning their investigation of this victim, and that at this time the police had already recovered four bodies of very similarly situated or seemingly situated victims. So two months after the original autopsy, Lifshultz determines that the cause Counsel, the inclusion of what the crime scene looked like, wouldn't that be something the medical examiner would consider? Of course. Yes, of course. Isn't that what the medical examiner did here? Presumably the court did. But the question is, we don't know the other things that the medical examiner considered. And it seems as though, from what Dr. Jones has said, that the medical examiner is relying in great part on what the detectives are telling him about Ms. Townsend and presumably these other victims. There was simply no independent medical or physical basis for his determination. And so what Jones' testimony tells us is that the police played a direct role in his cause and determination of death. Dr. Lifshultz could have said, cause of death undetermined. And Dr. Jones indicated that, you know, while what the report said was consistent with strangulation, there was no basis to include or exclude strangulation. Essentially that it was a deductive conclusion based on the fact that there was no other evidence of any other cause of death. What about the broken hyoid bone? It was not present here. Was it? Not present. And not necessarily in every case of strangulation is it present, but it's certainly a probative fact in determining strangulation when it is broken. So not broken in this case. And that's I think the problem is that there was no indication one way or the other from her physical body or using his medical expertise. And so essentially Dr. Leach, from what we can tell from Jones' testimony about it, assumed the position of the police and said, well, this is strangulation and homicide. And like I said, he could have ruled that the cause of death and the manner of death were undetermined, although of course the State's Attorney's Office rarely goes forward with homicide cases with that kind of determination from the medical examiner. So what we're arguing is that this is exactly the kind of case that Leach was saying, where the police play a primary role in the autopsy, which essentially transforms the independence of the medical examiner into one where he is providing evidence for later prosecution, which was not the issue in Leach because what the court said is, this medical examiner had a duty and an interest in performing this autopsy and the results could have exonerated or implicated Mr. Leach. But here the results could not have exonerated or implicated. They were solely meant to implicate and the basis being the police officer's investigation. So we would argue that this court is presented with that unusual case that the Illinois Supreme Court identified as existing with respect to the confrontation error and we request a new trial in Nicole Townsend's case. Thank you. Counsel, thank you very much. Thank you very much. Ms. Boland. Thank you. Once again, Assistant State's Attorney Mary Boland. One of the questions that you asked in the Batson argument, we'll start there, was whether an opportunity for rebuttal is required. Is that a mandated part of the procedure? And I cited to the court the Young case. It's an Illinois Supreme Court case that specifically denied the defense two things, an opportunity to, in a Batson claim, have a continuance to investigate the claim and then an opportunity to rebut through an offer of proof. And the Illinois Supreme Court said it's the discretion of the trial court that while rebuttal should be given an opportunity, it's the discretion of the trial court. And why did the court find that in Young? Because it was based on matters directly within the record. And that is the big distinction between this case and Martinez. In Martinez, it had to do with excluding a juror who had read a newspaper called The Defender. And the court in that Batson claim just stopped the analysis and said, oh, I find that facially valid, period. And so this court basically said, okay, that's the second step. Now go back and consider whether that has an impact. What impact does it have? Is it a genuine reason? Is it a persuasive reason? That's the difference. In the Martinez case, it's external. And there's no weighing of it. It's not directly before the court. The court can't read the person's mind. So there has to be something more. In Young, it was directly in the record. And the court was involved in every bit of the voir dire as the court was here. The court was very hands-on and recognized that many, many of the veneer had real concerns about the death penalty, including Lois Marshall. So I think that's the big distinction in this case. Those are the points that defense made. I think the three stages clearly were here. The court asked, you know, give me something. Give me a characteristic. Give me a similar juror. Give me something specific. And all the defense did was kind of repeat the exact same point in generalities. Well, they're comparably similar. At this point, nine jurors had been seated. Anybody could have been named. Just, you know, that's what the court was asking for, give me a name. So I think the court here clearly was very hands-on and voir dire, recognized the concern, and I think that these three stages have certainly been met here. If you don't have questions about Batson, let me turn to this DNA piece. I think the court is interested in this, and I think it's very, very important that we clarify some of the issues. Just stand in a review where you're clearly erroneous. Yes, that's correct. Absolutely correct. So if we look at this DNA issue, what we get is this highly qualified capital litigation defense team, the same team that raises the issue on the number of loci in the PCR testing in Luna, the same team, the same attorney, Mark Ryan, according to the defense, that actually conducts part of the deposition of Donald Parker, the same attorney who was present at the testimony of Colonel Reich, the same attorney who made the challenges that are referred to in Wright about wanting a DNA pair-wise auto search of the Illinois database, and yet the same team of attorneys is so ineffective that they don't know enough to challenge the DNA in this case. This case was about reasonable doubt. What was the defendant faced with in this case? The defendant was faced with, the defense team was faced with a man who planned his murders. He had a type of victim he selected. He would get his crack cocaine. He had a kill zone he stayed within. He knew the neighborhood. He selected certain types of victims. He used his offer of crack throughout every one of his cases. He chose his time and place. He gave his explanation as to his motivation. He was justified. They were going to trick him. They weren't going to do what they had agreed to. He ejaculated multiple times with no condoms by his own admission in each of these cases. He would have a disposal routine where he would take their pants and their shoes. In one case, he even sold the shoes. In another case, he took Claudia's jacket. He covered some of the bodies to avoid discovery. He moved some of the bodies for the same reason. He was well aware of what was going on. He knew authorities were looking for him. He even moved to the west side to avoid having to be involved in the buckleswabs sweeping. He followed the crimes in the paper. He gave videotaped confessions with highly detailed, very specific information, right down to the color of the buildings and whether they had inside stairwells or outside and whether it was a three-by-three ottoman in one case. The incredible recall of this individual is what faced the defense team in this case. This is not a Watson where there's a simple residential burglary, then some hairs are left, and we have a partial match at PCR testing levels. I was going to ask about the five versus 13. Okay. Your opponents seem to suggest maybe it's not as fair, not as accurate. Please address that. All right. You will notice that Watson and Wright are all about PCR testing. PCR is polymerase chain reaction testing, short tandem repeat type testing. The testing that was done in this case is restriction fragment length polymorphism. It's a completely different kind of testing. You will note that no expert, not the excerpt you got from, and by the way, the excerpt that you got from Donald Parker is missing 37 pages of the deposition. The excerpt that you got from Wright is missing the entire cross-examination. So the notion that you can take judicial notice of part of this that was never in the record below is very objectionable to the state, but you don't even have the complete record. And in Wright, by the way, the state's expert was also supplemented to the record, something that hasn't even been offered here. But in any event, RFLP testing has not been an issue in any of these cases. It's not the same kind of testing. It's a different enzyme-based testing of fragments, and I'm not a DNA expert, but I noted that when I looked at these cases, they're all about PCR testing. PCR has certain variabilities in certain loci, and the FBI has chosen 13 as the number, probably because the variabilities are less. RFLP has some 33 variabilities within each of those loci, and so the FBI treated five loci as sufficient. There's been no challenge in any of the material that has been cited, any of the references, any of the scientific studies that were looked at in Wright or even discussed in Watson. Even Justice Burkett talks about the question of whether random match probability in his dissent in Watson is even challengeable based on the K article that is cited in Wright, because actually K doesn't object to random match probability. And if you had the entire attachment, which we object to the attachments of law, but if you had the entire attachment, you would see that Carl Wright doesn't disagree with random match probability, and Donald Parker says, I'm not a statistician. I can't answer questions about statistics. So you see, you can't compare apples and oranges. RFLP testing is a very different kind of testing. Do both tests signify matches at a certain number of loci, whether it's 5 or 4 or 9 or 14? But there are different, apparently there are different variations and alleles within the numbers, and my understanding is it's not even the same number of loci, it's not even the same loci. It's different markers within the gene structure. And that is why, this really points out why we don't want to start here on appeal when we don't have a record, we don't have expertise, we don't have adversarial testing of this whole issue, and suddenly on appeal we try to take apples and we compare them to oranges and then say you should make the same concerns. And I don't think there's an expert out there that I could find in my review of all the research that even makes this challenge with regard to RFLP testing. We had some discussions a while ago with opposing counsel about the fact that the trial was so long ago, and of course this is something that science evolves very rapidly. At the time of the trial, wasn't it possible for the state to have retested the biological material and used the more modern methods? And if so, doesn't that at least color the ineffective assistance of counsel argument? Well, we did apparently retest the Patricia Dunn and the Constance Bailey. That was the first case and the very last case, and we were able to get PCR. And by the way, those additional markers, the defendant won the lottery again. So now he has all the 13 loci matches in those evidence in that case that started out as the five loci RFLP matches in the evidence. But what happens in, and my understanding is why RFLP was replaced by PCR testing, is because you needed so much DNA that it was problematic in prime scene type samples where you only have a small amount or, for instance, saliva doesn't have a lot of DNA in it. And so the idea was to be able to replicate or amplify, what they call amplify, smaller amounts of DNA through the PCR process. That's what it is. It's a reaction process that amplifies many, many times short tandem repeat DNA sections so that they can be analyzed. With RFLP, it was an enzyme-based process, and you needed a lot of DNA. So I am quite sure that if we had extra DNA to be able to establish that 13 loci at the PCR level, we may have gone on and done that. I will tell you, though, one other piece that's important is when you were talking about these auto searches through the databases that have been raised in some of these cases, the FBI doesn't do RFLP searching, and neither does the Illinois database. So the only thing that you would come up with is the Constance Bailey information and the Patricia Dunn information because those have been retested and now are showing 13 loci matches. And that is precisely why. I mean, here you have Mark Ryan, who is apparently the king of DNA in these cases, making amazing arguments, and he chooses not to challenge it here. Why? Because he could allow the inference to sit out there that why we have some 13 loci in these cases, but only five in those cases. And he did cross-examine each of these analysts, and he got them to say, as they would honestly do, that the state police had changed and they're now doing PCR testing. And so that inference sits out there as just a matter of reasonable doubt, and it just permanates, and it allows the defense to argue that there's not enough physical evidence in these cases and that the only person that links these people to their fate is Hubert Geralds. So it was definitely a trial strategy by a dream team of defense attorneys, and to argue now that somehow we can compare apples and oranges on appeal is a problematic slope and difficult to sustain. Counsel, do you want to address the Leach and Melendez-Diaz? Sure. The final argument is twofold that the defendant makes. And the first argument is Leach is wrong, and I don't think this Court has the luxury to decide, well, we're just not going to follow Leach. Leach clearly analyzed the issue and states that the autopsy report is not testimonial. The testimony of a substitute medical examiner does not violate confrontation. Now, the Leach Court did leave open this exception, and the defendant kind of jumps onto the exception and says, we're not saying that never could an autopsy report be testimonial. But in this case, we not only have Dr. Lifshultz, who, as defense correctly notes, originally penned the investigation, but there were toxicology reports that needed to be completed. No doubt there was material that needed to be developed from the crime scene. So in this case, the state of the body was such that he penned the investigation. And then two months later, once he got the necessary information, made his decision. But he wasn't here to testify, and the medical examiner, Dr. Jones, came in and said, I've reviewed everything, and it is my opinion that this person has a cause of death of homicide as well. And it's based on, and Dr. Jones gave all of the information that she based her consideration on, which is all ordinary information that a medical examiner bases their considerations on. So this is not the rare exceptional case in which the Leach exception needs to be examined. In fact, at the time these decisions were made, it would be almost two years, about a year and a half before a defendant was even identified. So this wasn't about targeting somebody. This wasn't about preparing it for a prosecution. This was your ordinary medical examiner finishing cases, closing them out, staffing them. And Dr. Jones talked about that in her testimony as well. So Leach applies. It clearly disposes of this issue. There's no exception to be considered here. Thank you very much. Counsel, five minutes. I'd like to make a comment on each of the three issues. With respect to Batson, the state concedes in its brief that the third step was not done. Its argument is essentially a harmlessness argument, that the decisive question is whether or not there was a discriminatory intent in the race-neutral reason. Well, we have a process for determining that, and it's the third step. The state has not cited a single case in which it says that a harmlessness analysis applies where a judge fails to conduct the third step of the Batson analysis. Again, as it did in its brief, the state, I believe, misleads with respect to the judge's inquiry of defense counsel. The judge accepted that the defense had made a prima facie case, and if it had wanted more information, the defense likely would have given it, but accepted it. So therefore, hamstrung the defense, listened to the race-neutral reason, and then complained that it didn't have more from the defense when it denied the defense the opportunity to do just that. So please, I urge you to look at the record with respect to the judge's exact findings. And with respect to Young, Young was about whether a continuance could be granted for the defense to substantiate its Batson motion, which is, of course, traditionally always a matter of discretion. Whether a judge actually follows the Batson procedure is not.  With respect to DNA, the state says that we're comparing apples to oranges with respect to the two different methods. We simply are not. I mean, while these are two different ways to test DNA, one is clearly superior, which is why it is now the standard. One is clearly more reliable. Even the state's witnesses, Tracy Reppin, said RFLP, the five loci standard, is the older version of DNA testing. Brenda Phillips said, when asked if RFLP was still accepted, actually it's been phased out. We use PCR-STR. So it's not as if these two methods are alternatively used. PCR-STR is the standard used, and it's not the standard that was used in these cases. So, yes, all of the cases that this Court has recently seen on DNA testing, those are all about PCR-STR testing, and that's because that's what we use now. That's the reason why those cases deal with that particular method and not the stale and outdated method we have with respect to six of these victims. With respect to Leach, finally, Jonas did not actually state that strangulation was her medical opinion. What she said is that there were other possible causes of death, some of which were non-criminal, including, for instance, cocaine overdose. And there was cocaine in Ms. Townsend's system. She said that Dr. Lifsholz's opinion was based on a lack of injury, and therefore it wasn't inconsistent with strangulation, but presumably many other things were not inconsistent. And then when pressed on cross-examination, whether Dr. Lifsholz's conclusion was within a reasonable degree of medical certainty, she said, I don't know. I could be more sure if I had done the exam. And that's why Crawford was required and was entitled to have Dr. Lifsholz available to him to ask him, what are the things that you considered in determining this? What kinds of conversations did you have with the police? What did you know about these patterns of murders at the time? And like I said in the opening, I would stress, that her cause of death was undetermined. And he didn't. He said it was strangulation based on no independent medical or physical basis. And therefore, we do, in fact, fall within the narrow window that Leach left open for testimonial reports made by medical examiners. And for those reasons and those set forth in the brief, we request a limited remand on the Batson issue and a new trial with respect to Ms. Townsend. Thank you. Counselors, I want to thank you for the excellent argument you made here today before the court, and at this point we'll be adjourned. Thank you.